UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2003 NOV -5  A 11: 42

US DISTRICT COURT
BRIDGEPORT CT

NATHAN ROSEN,

                Plaintiff,

- against -

INTERNATIONAL BUSINESS MACHINES
CORPORATION; MEDIANET, INC.; ACS
TRADEONE MARKETING, INC.;
AFFILIATED COMPUTER SERVICES, INC.;
JOSEPH FERRIS; JOHN SCHIEVE and DALE
REBHORN,

                Defendants.

CIVIL ACTION NO.
3:01-CV-00743(JCH)

November 5, 2003

## THE IBM DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION TO STRIKE THE AFFIDAVIT OF JEFFREY PAUL

Submitted By:

Patrick W. Shea (ct 07071)
Neil B. Stekloff (ct 19778)
Paul, Hastings, Janofsky & Walker LLP
1055 Washington Boulevard
Stamford, CT 06901-2217
Telephone:   (203) 961-7400
Facsimile:   (203) 359-3031
patrickshea@paulhastings.com
neilstekloff@paulhastings.com

COUNSEL FOR DEFENDANTS IBM, JOSEPH
FERRIS, JOHN SCHIEVE AND DALE REBHORN

## I. PRELIMINARY STATEMENT

Most striking about Plaintiff Nathan Rosen's ("Rosen") Memorandum of Law in Opposition to the IBM Defendants' Motion to Strike the Affidavit of Jeffrey Paul ("Paul") dated October 22, 2003 ("Rosen's Memorandum") is Rosen's complete failure to dispute the four (4) fatal admissions from Paul's deposition that render his August 11, 2003 Affidavit worthless:

- Paul is unable to identify any specific tasks that Rosen could have done for Sequel Technology ("Sequel") in the 4Q99 and unable to identify anything that Rosen had been asked to do for Sequel in the 4Q99 which Rosen had not done. Compare IBM Defendants' Memorandum of Law in Support of Their Motion to Strike ("Motion to Strike") at 4-5 with Rosen's Memorandum.

- Paul is unable to identify any specific sales that Sequel would have closed in the 4Q99 if Rosen had spent "additional time" performing unspecified "follow-up" activities. Compare Motion to Strike at 5 with Rosen's Memorandum.

- In light of the foregoing, the sole basis for Paul's opinion that Sequel would have generated approximately $2.5 million in 4Q99 sales if only Rosen had done "more" for Sequel is that, when Paul was employed by a different company years earlier (*i.e. not* Sequel), selling a different software product (*i.e. not* Sequel's product), working in conjunction with a different IBM sales representative (*i.e. not* Rosen) under a different software sales program, that other company had "better sales, more sales" than Sequel had in the 4Q99 – although Paul is unable to quantify what "more sales" means. Compare Motion to Strike at 6-7 with Rosen's Memorandum.

- Paul, in fact, has "no way of knowing" what level of sales Sequel might have had in the 4Q99 if only Rosen had done "more" for Sequel instead of focusing his efforts on Torrent Systems ("Torrent"), another of his ISV Partners – and Paul has no explanation whatsoever for how he arrived at his $2.5 million guess. Compare Motion to Strike at 7 with Rosen's Memorandum.

Rosen instead tries to construct a series of misguided legal and factual arguments suggesting that the opinions set forth in Paul's Affidavit are nonetheless admissible for summary

-1-

judgment purposes, notwithstanding these four fatal admissions.[1] As set forth below, Rosen is mistaken on all counts, and Paul's Affidavit should be stricken pursuant to Fed. R. Civ. P. 56(e) because his sworn deposition testimony confirms beyond dispute that the opinions stated in his Affidavit, namely Paragraph 6, would be inadmissible at trial under Fed. R. Evid. 701.

## II. DISCUSSION

### A. Rosen's Argument That the Paul Affidavit Itself Need Not Be Admissible is Misplaced, As The Opinions Contained In The Paul Affidavit Are Not Admissible In Light of Paul's Deposition And, Therefore, Those Opinions Cannot Be Considered on Summary Judgment.

Rosen wastes more than an entire page his Memorandum establishing the non-controversial, boilerplate proposition that "the nonmoving party [need not] produce evidence in a form that would be admissible at trial in order to avoid a summary judgment." See Rosen's Memorandum at 5-7 (citations omitted). Setting aside the obvious concession on Rosen's part that the Paul Affidavit itself is not currently in admissible form, the IBM Defendants have never argued to the contrary.

Rather, the crux of the IBM Defendants' argument is that *the information contained in Paul's Affidavit*, namely his ultimate opinion in Paragraph 6, cannot be presented in *any* admissible form at trial because Paul confirmed in his deposition that his $2.5 million "belief with a reasonable degree of certainty" is actually nothing more than rampant speculation not based on any rational perception of fact.

---

[1] For some inexplicable reason, Rosen makes a point of noting that the Motion to Strike was brought only by the IBM Defendants and not by Defendants ACS TradeOne Marketing, Inc. and Affiliated Computer Services, Inc. (collectively the "TradeOne Defendants") – and, therefore, that the Paul Affidavit remains "unchallenged in respect to the claims brought against these defendants." See Rosen's Memorandum at 1 n.1. This is puzzling because Paul's Affidavit clearly pertains only to Rosen's fraudulent and negligent misrepresentation claims against the IBM Defendants arising out of alleged misstatements or omissions concerning the Large Opportunity Process ("LOP"), set forth in Counts One and Four. Rosen's only claim against the TradeOne Defendants is found in Count Ten, which purports to state a claim for the aiding and abetting of a statutory theft with respect to commissions arising out the Torrent 3Q99 Citibank Subscription transaction discussed in the IBM Defendants' summary judgment briefs. Torrent's Citibank Subscription transaction has nothing whatsoever to do with Sequel or Paul and, therefore, it is completely unremarkable that only the IBM Defendants filed the instant Motion to Strike.

See McMillan v. Experian, 170 F. Supp.2d 278, 281 (D. Conn. 2001) ("affidavits submitted to defeat summary judgment must be admissible themselves *or must contain evidence that will be presented in an admissible form at trial*") (quoting Santos v. Murdock, 243 F.3d 681, 684 (2d Cir. 2001) (2001)) (emphasis in original); 10B Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure, §2378 (3d ed.) (hereafter "Wright & Miller") (noting that, with respect to affidavits submitted in opposition to summary judgment, "the first requisite is that the information they contain (as opposed to the affidavits themselves) would be admissible at trial").

The proper focus is therefore not whether the Paul Affidavit itself is admissible at trial, but whether, in light of his sworn deposition testimony, Paul would be permitted to testify at trial that "had Mr. Rosen been able to provide the additional time to Sequel [in the 4Q99], I believe, with a reasonable amount of certainty, that Sequel would have exceeded its quota in 1999 (of approximately $723,000.00) and generated revenues in excess of $2.5 million in 1999." See Paul Aff., ¶6. As set forth fully in the Motion to Strike, Paul's opinion (or "belief") in this respect would not be admissible at trial under Fed. R. Evid. 701 because he admitted in his deposition that it is based on no specific facts whatsoever and, in fact, that Paul has no idea what level of sales, if any, increased effort from Rosen might have generated for Sequel in the 4Q99.

Paul's Affidavit, and Paragraph 6 in particular, should therefore be stricken under Fed. R. Civ. P. 56(e). See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 643 (2d Cir. 1988) (noting that affidavits containing inadmissible hearsay under the Federal Rules of Evidence should be stricken at the summary judgment stage under Rule 56(e)); Millgard Corp. v. White Oak Corp., 224 F. Supp.2d 425, 429 n.7 (D. Conn. 2002) (striking portions of affidavit under Rule 56(e) where the affidavit did not indicate that statements were made on personal knowledge under Fed. R. Evid. 602 and noting that "the Federal Rules of Evidence are applicable when deciding a summary judgment motion"); 10B Wright & Miller, Federal Practice & Procedure, §2378 ("[b]ecause the policy of Rule 56(e) is that the judge should

consider any material that would be admissible at trial, the rules of evidence and the exceptions thereto determine what averments the affidavit may contain").

    **B.**    **Rosen Has Not Demonstrated That Paul's "Belief" Is Rationally Based On Any Perceptions of Fact, As Paul's Own Testimony Confirms That He Has No Rational Basis in Fact For His "Belief."**

Rosen attempts to demonstrate that Paul's $2.5 million opinion is rationally based on his perceptions as a witness and therefore admissible under Fed. R. Evid. 701, asserting that Paul has "extensive personal experience" in the marketing and sales of software products, see Rosen's Memorandum at 2, and that the $2.5 million figure specifically is based on projections with respect to "specific customers" through which Sequel could have closed sales in the 4Q99 if only Rosen had provided additional "support" and "follow-up."[2] See id. at 7. This does not pass muster under Rule 701 for the following reasons:

---

[2] Rosen claims that the IBM Defendants "acknowledge in their memorandum that Fed. R. Evid. 701 only requires that the witness have a *first-hand basis* for his perception and that the statements be helpful for the jury in making a determination about the loss of revenues." See Rosen's Memorandum at 10 (emphasis added). Rosen is incorrect both as to the contents of the IBM Defendants' Motion to Strike and the law itself. Compare id. with Motion to Strike at 8-9. Rule 701 requires more than a "first-hand basis" for the witness's perception -- it requires a *rational basis* that must be assessed objectively. See, e.g., Fed. R. Evid. 701(a); United States v. Garcia, 291 F.3d 127, 140 (2d Cir. 2002) (noting that the witness offering lay opinion testimony must establish the "*objective* basis for his opinion" so that the Court may assess "whether it is rationally based on the witness's perceptions"); United States v. Rea, 958 F.2d 1206, 1216 (2d Cir. 1992) (noting that "when a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701 . . . because there is no way for the court to assess whether it is rationally based on the witness's perceptions"). This is an important distinction which demonstrates that Paul cannot clear the Rule 701 hurdle merely by stating that he was "personally involved and experienced" in the Sequel-IBM relationship. See Rosen's Memorandum at 10. He must instead demonstrate *objectively* that his opinions are *rationally based* on his perceptions – which his sworn deposition testimony precludes him from doing.

1.  **Rosen's Reliance on the "Specific Customers" Referenced in Paul's Affidavit is Misplaced Given Paul's Sworn Deposition Testimony That Rosen *Did* Assist Sequel in Soliciting All Such Customers And That He Cannot Identify a Single Sale With Respect to These "Specific Customers" That Would Have Closed Even With "More Follow-Up" From Rosen.**

First, with respect to the so-called "specific customers" referenced in Paul's Affidavit, Rosen ignores the fact that Paul testified that Rosen *did*, in fact, sponsor and arrange sales calls for Sequel with respect to *all* such customers; that IBM supported Sequel on all such sales calls; and that *none* of the sales calls to these "specific customers" was successful. Compare Motion to Strike at 5 n.2 with Rosen's Memorandum. When this is combined with Paul's admission that he cannot point to a single sale that Sequel would have closed with any of these "specific customers" even *with* "more follow-up" from Rosen, there is simply no objectively rational basis for Paul's opinion that these "specific customers" would have magically generated $2.5 million in 4Q99 sales if only Rosen had provided "more" of the same unsuccessful "support" and "follow-up" that he and IBM provided Sequel all along. As Paul himself said, he has "no way of knowing" if Sequel really would have generated $2.5 million in 4Q99 sales but for Rosen's lack of "support" and "follow-up" – let alone any sales at all.[3] That figure is a factually baseless guess plucked out of thin air and may not be used to create an issue of fact on the detrimental reliance element of Rosen's claims for fraudulent and negligent misrepresentation.

---

[3] Paul's Errata Sheet, attached as Exhibit B to the Affidavit of Richard A. Bieder in Opposition to the Motion to Strike ("Bieder Aff."), is of absolutely no assistance to Rosen here, as Paul merely reaffirms that "although I cannot identify any specific sales, I should explain that I do believe sales by Sequel would have been made to the customers I identified in my affidavit had Mr. Rosen provided additional support and follow-up to Sequel." Id. (pertaining to page 61, line 15 of the Paul Depo.). Paul is essentially saying that, while he acknowledges that he has not relied on or considered any specific facts in forming his belief, he nevertheless continues to believe it. Unfortunately for Rosen, the sincerity of Paul's belief does not make it admissible under Fed. R. Evid. 701.

2. **Paul's Alleged "Personal Experience" With IBM's SVMP Program While Employed At Isogon Does Not Provide a Rational Basis For Paul To Opine That Sequel, an ISV, Lost Out on $2.5 Million in 4Q99 Sales, Because the SVMP and ISV Programs Are Fundamentally Different.**

Rosen's Memorandum also claims that Paul's $2.5 million opinion is bolstered by his "personal experience with the revenues generated by IBM's SVMP program" – which Rosen asserts elsewhere in his Memorandum is synonymous with IBM's ISV program. See Rosen's Memorandum at 2 (asserting that IBM's ISV program was "known as the SVMP"); id. at 7 (asserting that Paul had "personal experience with the revenues generated by the SVMP program"). This is, at best, an inadvertent mistake by counsel and, at worst, a blatant misrepresentation of the record, as Rosen knows full well that the SVMP program and ISV program are two different sales programs such that even if Paul had "personal experience" with IBM's SVMP program (which he obtained at Isogon, not Sequel), see Rosen's Memorandum at 4-5, this would not provide an objectively rational foundation for him to opine as to Sequel's lost ISV sales in the 4Q99.

For example, Paul testified that the SVMP program was a "reseller" program in which *IBM purchased* another company's software product, branded it as an IBM product, and resold it directly to customers through the IBM sales force. See Paul Depo. at 55-56 (attached to Bieder Aff. as Exhibit A). IBM salespeople received commissions on SVMP sales, but IBM did not compensate Sequel for them (apart from buying the software itself). Id. In contrast, the ISV program is essentially the opposite of the SVMP program: the *ISV purchases* IBM's software product and incorporates it with its own product to create a new, combined ISV-IBM product that the *ISV resells* to customers (or "influences" to be sold in some cases). See IBM Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment on Plaintiff Nathan Rosen's Second Amended Complaint [doc.#93], at 3-5 (explaining the ISV program). The difference is significant: under the SVMP program, IBM is doing the selling itself through IBM's own sales force whereas, under the ISV program, the ISV is generally doing the selling.

This distinction further undermines the already-discredited notion that Paul may rationally opine as to the amount of Sequel's lost sales in the ISV program in the 4Q99 based solely on his experiences at Isogon in IBM's SVMP program years earlier. Compare Rosen's Memorandum at 4-5 with Motion to Strike at 6-7. The fact that *IBM's sales force* may have been successful selling Isogon's product under the IBM brand name in the SVMP program has no bearing whatsoever on whether *Sequel* would have sold $2.5 million of the combined ISV product in the 4Q99 if only Rosen had provided more "follow-up" to Sequel's potential customers. Worse yet, Paul does not even purport to rely on *actual sales data* with respect to Isogon's performance in the SVMP program – noting only that they had "better sales, more sales" than Sequel. See Motion to Strike at 7. Nor does Paul even purport to have examined, much less relied upon, Sequel's allegedly "detailed sales projections" based on Sequel becoming enrolled in IBM's SVMP program.[4]  See Rosen's Memorandum at 7 n.8; Paul Errata Sheet (attached to Bieder

---

[4] Rosen's Memorandum asserts that IBM was unable to get Sequel into the SVMP program, which he claims "led to the loss of revenues at Sequel and Rosen's consequential loss of commissions arising from those revenues." See Rosen's Memorandum at 5. This again reflects Rosen's counsel's misunderstanding (or misrepresentation) of the fundamental differences between the SVMP program and ISV program, explained above. It is undisputed that Sequel was *already* a member of the ISV program and that Rosen was the IBM Business Development Manager ("BDM") responsible for Sequel as an ISV. Paul testified that Rosen was *also* working on getting Sequel into the SVMP program in 1999, but that "the contract never got done," which Paul stated was a "shortfall on [Rosen's] part." See Paul Depo. at 66-67 (attached to Affidavit of Patrick W. Shea, Esq., dated October 7, 2003 ("Shea Aff.") as Exhibit A). While this may have led to the "loss of revenues at *Sequel*," as Paul claims, it certainly could not have led to a "consequential loss of commissions" by *Rosen* because, as a BDM working with ISVs, Rosen received commissions only on ISV sales within the scope of the applicable ISV contract. In other words, even had Rosen gotten Sequel into IBM's SVMP program, Rosen would not have received commissions on direct SVMP sales of Sequel's product by IBM's sales force – meaning that he cannot rely on this in order to demonstrate detrimental reliance on his fraudulent and negligent misrepresentation claim.

Aff. as Exhibit B).[5]

For these reasons, no rational jury could credit Paul's *non-sequitir* "belief" that because Isogon, his previous employer, had success working with different IBM sales representatives selling different software products under the framework of a different IBM sales program, Sequel would have generated $2.5 million in 4Q99 sales if only it had "more follow-up" from Rosen. His "belief" is therefore inadmissible, and the Motion to Strike should be granted.

3. **The Case Law Permitting Corporate Executives To Give Lay Opinion Testimony As to Their Company's Lost Profits Is Of No Assistance To Rosen And, In Fact, Further Demonstrates That Paul's Opinion Does Not Meet The Legal Standards Applied in Rule 701 Cases.**

Finally, Rosen relies on case law permitting corporate executives to provide lay opinion testimony under Fed. R. Evid. 701 with respect to their company's lost profits. See Rosen's Memorandum at 10-11. There is an obvious common thread in the cases cited by Rosen, however, that is undeniably lacking here: in each case, the corporate executive's opinion about his company's lost profits was based on a specific factual foundation, including analysis of actual historical sales data and other specific evidence of actual lost customers or sales. Contrast that to Paul, who admits that he has "no way of knowing" whether his $2.5 million guess is accurate, as it is not based on any actual Sequel historical sales data (or even actual Isogon sales data) or any other specific evidence of lost customers or sales.

---

[5] Rosen accuses the IBM Defendants of "improperly bolstering their arguments" by failing to attach or cite to Paul's unsworn errata sheet in the Motion to Strike. See Rosen's Memorandum at 3 n.5. However, the Second Circuit has made clear in this context that a deponent's original deposition answers remain part of the record and can be relied upon for summary judgment, and that the *deponent* is "free to introduce the amended answer and explain the reasons for the change." See Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 103 (2d Cir. 1997). The IBM Defendants therefore attached only those portions of Paul's sworn deposition testimony that support their Motion to Strike, leaving Rosen free to introduce Paul's unsworn errata sheet if he felt that the errata sheet bolstered his opposition. Tellingly, other than his baseless accusation against the IBM Defendants, it does not appear that Rosen relies upon Paul's errata sheet for any substantive purpose -- which is fitting given that Paul's errata sheet says precious little beyond reconfirming the unsupported "beliefs" set forth in his Affidavit.

Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 265 (2d Cir. 1995), proves this point. In Securitron, the Court permitted Cook, the President of Securitron, to provide opinion testimony as to Securitron's lost sales and lost profits in a defamation case. Id. In doing so, however, the Court pointed out that Cook had identified specific Securitron customers who stopped dealing with Securitron, as well as the fact that Cook had closely examined Securitron's actual sales data over a number of years and relied on empirical evidence of a slow-down. Id. Indeed, the Court noted that "a company president is certainly capable of projecting lost profits *where the projection is based on evidence of decreased sales.*" Id. (emphasis added).

Likewise, in Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1174-75 (3rd Cir. 1993), another case cited by Rosen, see Rosen's Memorandum at 11-12, the Court permitted lay opinion testimony on the issue of damages by Lighting Lube's owner, Venuto. Like Cook, Venuto arrived at his damages estimate by analyzing historical data as to the number of franchises he had sold in prior years and the historical profits he earned on those franchises – and, with respect to future profits, he worked with an accountant to devise a formula, again based on historical data, to estimate the number of additional franchises that would have been sold in the future over a ten-year period. Id. at 1174-75. Venuto also was able to explain his cost-estimates "line by line, explaining why his operation was cheaper to run ... and thus why he would make the anticipated profits." Id. at 1175. See also Static Control Components v. Darkprint Imaging, Inc., 240 F. Supp.2d 465, 481 (M.D.N.C. 2002) (admitting lay opinion testimony of Static Control's president, who had "firsthand knowledge of Static Control's pricing and profit margins over a number of years," and noting that "[t]he key question is *whether there is a foundation* upon which the lay witness can testify regarding lost profits") (emphasis added).

Here, in stark contrast to the corporate executives permitted to opine as to lost profits in Securitron, Lightning Lube and Static Control, Paul cannot identify any specific sales that Sequel would have closed if only Rosen had done "more" in the 4Q99, nor does he even purport to base his $2.5 million

"belief" on any historical data reflecting actual sales by Sequel during the course of Sequel's ISV relationship with IBM.[6] Instead, Paul seeks to simply decree, that he "believes" that Sequel would have generated $2.5 million in 4Q99 sales if only Rosen had focused his efforts on Sequel and not on Torrent, notwithstanding that he has "no way of knowing" if that number is accurate. Even under the Rule 701 analysis applied in Securitron, Lightning Lube and Static Control, it is beyond peradventure that Paul's $2.5 million "belief" would be inadmissible at trial in light of his sworn deposition testimony.

### III.  CONCLUSION

For all of the foregoing reasons, and for those reasons set forth in the IBM Defendants' Motion to Strike, the Paul Affidavit, and Paragraph 6 in particular, should be stricken from the record pursuant to Fed. R. Civ. P. 56(e).

Dated: Stamford, Connecticut
November 5, 2003

Respectfully Submitted,

By: _____
Patrick W. Shea (ct 07071)
Neil B. Stekloff (ct 19778)
Paul, Hastings, Janofsky & Walker LLP
1055 Washington Boulevard
Stamford, CT 06901-2217
Telephone: (203) 961-7400
Fax: (203) 359-3031

Counsel for the IBM Defendants

---

[6] Had Paul even looked at Sequel's actual sales data with respect to its ISV partnership with IBM, he would have seen that, through the *first three quarters* of 1999, when Sequel supposedly had Rosen's full attention, Sequel generated only approximately $16,000 in sales – or two percent (2%) of its ISV commitment level. See Motion to Strike at 4 n.1. This fact makes Paul's guess that Sequel would have generated $2.5 million in the 4Q99 alone, but for Rosen's neglect, seem even more outlandish.

## CERTIFICATE OF SERVICE

The undersigned, a Member of the Bar of this Court, hereby certifies that he has caused to be served a true and correct copy of the foregoing **The IBM Defendants' Reply Memorandum in Further Support of Their Motion to Strike Affidavit of Jeffrey Paul** via courier on the following counsel of record on this 5th day of November 2003:

> Richard A. Bieder, Esq.
> Neal A. DeYoung, Esq.
> Koskoff Koskoff & Bieder
> 350 Fairfield Avenue
> Bridgeport, CT 06604

_____
Neil B. Stekloff

STM/262099.1

-11-