UNITED STATES DISTRICT COURT    FILED
DISTRICT OF CONNECTICUT

2003 OCT -7  P 1: 40

| | |
|---|---|
| NATHAN ROSEN, | CIVIL ACTION NO. |
| Plaintiff, | 3:01 CV 00743(JCH) |
| - against - | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION; MEDIANET, INC.; ACS TRADEONE MARKETING, INC.; AFFILIATED COMPUTER SERVICES, INC.; JOSEPH FERRIS; JOHN SCHIEVE and DALE REBHORN, | October 7, 2003 |
| Defendants. | |

**THE IBM DEFENDANTS' REPLY MEMORANDUM IN FURTHER
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF
NATHAN ROSEN'S SECOND AMENDED COMPLAINT AND ON DEFENDANTS
JOHN SCHIEVE'S AND DALE REBHORN'S COUNTERCLAIMS AGAINST PLAINTIFF**

Submitted By:

Patrick W. Shea (ct 07071)
Neil B. Stekloff (ct 19778)
Paul, Hastings, Janofsky & Walker LLP
1055 Washington Boulevard
Stamford, CT 06901-2217
Telephone:    (203) 961-7400
Facsimile:    (203) 359-3031
patrickshea@paulhastings.com
neilstekloff@paulhastings.com

COUNSEL FOR DEFENDANTS IBM,
JOSEPH FERRIS, JOHN SCHIEVE AND
DALE REBHORN

## TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT..............................................................................1

II.  DISCUSSION ....................................................................................................1

    A.   Rosen's Opposition Raises No Genuine Issue of Material Fact To Be Tried On
His Claims for Breach of Contract and Unpaid Wages Under Conn. Gen. Stat.
§31-72 And, Therefore, Summary Judgment Should Be Granted On Counts
Fourteen and Fifteen of the Complaint In Their Entirety ...........................................1

        1.   Counts Fourteen and Fifteen Fail As A Matter of Law as They Pertain
to the LOP and Citibank Subscription Because It is Undisputed That
Torrent Signed a DLA Contract Requiring it To Directly Sell A
Combined Torrent/IBM Software Product And All Torrent 1999 Sales
In Issue Here Were "Influence" Sales.................................................................3

        2.   Each of Rosen's Arguments in Opposition to Summary Judgment on
Counts Fourteen and Fifteen Pertaining to the LOP and the Citibank
Subscription Is Unavailing In Light of the Undisputed Facts and
Definitive Contract Language .........................................................................5

            a.   Rosen's Assertion that the IBM Defendants Rely on the
"Wrong Plan" Is Nothing More than A Cynical Attempt to
Distract the Court, As He Does Not Dispute The Definition of
"PCO1 Billed Revenue" Under the Plan................................................6

            b.   Rosen's Assertion That IBM Had a "Standard Practice" of
Paying BDMs Commissions on "Influence" Sales Even Under
DLA Contracts Fails As a Matter of Law To Create a
Contractual Obligation on IBM's Part to Pay Commissions on
All Such Sales .....................................................................................7

            c.   Rosen's Errata Sheet Does Not Create A Disputed Issue of
Material Fact on These Claims, Nor May He Use The Errata
Sheet To "Retract" His Prior Admissions That He Knew He
Was Being Paid For "Influence" Sales on an "Exception Basis." ......11

        3.   Count Fifteen Also Fails As It Pertains to the $4127.13 in Retroactive
Adjustment, As Rosen's Opposition Does Not Even Address This
Issue, Let Alone Raise a Disputed Issue of Material Fact to Be Tried ..........13

    B.   Rosen's Opposition Raises No Genuine Issue of Material Fact to Be Tried On
His Claims for "Statutory Theft" Under Conn. Gen. Stat. §52-564, Warranting
Summary Judgment on Counts Two, Seven, Ten and Eleven of the Complaint........14

    C.   Summary Judgment Should Be Granted On Count Six Because Connecticut
Does Not Recognize a Cause of Action for "Negligent Investigation" In the
At-Will Employment Context..................................................................................16

# TABLE OF CONTENTS
(continued)

Page

D.    Rosen's Fraudulent and Negligent Misrepresentation Claims in Counts One and Four, Respectively, Fail As a Matter of Law Because Rosen Cannot Demonstrate Detrimental Reliance In Light of His Sworn Deposition Testimony .................................................................................................... 19

1.    Rosen's Attempt To Contradict His Deposition Testimony That It Was His Job To Ensure That Torrent Reported Its Sales in a Timely Manner Is Misguided, As Even His "New" Story Does Not Create A Genuine Issue of Material Fact .................................................................................. 20

2.    Rosen Has Not Come Forward With Any Admissible Evidence Demonstrating That He Would Have Been Able To Recruit Any New ISVs Or That His Existing ISVs Would Have Generated Additional 4Q99 Sales Had He Not Been Focusing His Efforts on Torrent ................... 23

E.    Summary Judgment Should Be Granted As to Liability on All Four of Schieve's and Rebhorn's Counterclaims Against Rosen Because Rosen Admits That He Illegally Taped Private Telephone Conversations Without Consent ........... 25

III.    CONCLUSION ............................................................................................................... 27

STM/258709.4

## I.    PRELIMINARY STATEMENT

Plaintiff Nathan Rosen's ("Rosen") Memorandum of Law in Opposition to the IBM

Defendants' Motion for Summary Judgment ("Rosen's Opposition") packs its forty-eight (48) pages

with wild accusations of conspiracy, blatant mischaracterizations of the record, and numerous instances

where Rosen directly contradicts his sworn deposition testimony in this case.  Fortunately for the Court,

Rosen is completely unable to dispute eight (8) *material* facts relevant to the legal grounds on which the

IBM Defendants seek summary judgment on the remaining twelve (12) counts in Rosen's Second

Amended Complaint [doc. #30] (the "Complaint").  When the Court focuses on just these eight

undisputed material facts, it is apparent that the IBM Defendants' summary judgment motion should be

granted in its entirety – and, thus, the Court need not delve into the countless *non-material* factual

disputes Rosen attempts to present.[1]

## II.    DISCUSSION

**A.    Rosen's Opposition Raises No Genuine Issue of Material Fact To Be Tried On His Claims for Breach of Contract and Unpaid Wages Under Conn. Gen. Stat. §31-72 And, Therefore, Summary Judgment Should Be Granted On Counts Fourteen and Fifteen of the Complaint In Their Entirety.**

The bulk of Rosen's Opposition focuses on his distorted version of the "facts" with

respect to IBM's communications concerning application of the Large Opportunity Process ("LOP") to

Rosen and other IBM Business Development Managers ("BDMs") in 1999.  See Rosen's Opposition at

2-21, 26-46.  This is regrettable, as the IBM Defendants seek summary judgment on the wage law and

---

[1] The IBM Defendants also submit the Reply Affidavit of Neil B. Stekloff ("Stekloff Reply Aff."), which includes copies of any new exhibits referenced herein.  The Stekloff Reply Aff. is different than the Affidavit of Neil B. Stekloff dated May 1, 2003 ("Stekloff Aff."), which includes those exhibits cited in the IBM Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("IBM Defendants' Memorandum").  In order to minimize confusion, the Stekloff Reply Aff. picks up the exhibit numbers where the Stekloff Aff. stopped.  Thus, the Stekloff Aff. contains the IBM Defendants' Exhibits 1-26, and the Stekloff Reply Aff. begins with Exhibit 27.

breach of contract claims in Counts Fourteen and Fifteen on a purely legal theory having *nothing whatsoever* to do with the LOP language, communications about the LOP, or the disclaimer in Rosen's Sales Incentive Plan (the "Plan") permitting IBM to modify the Plan. For this reason, it is completely unnecessary for the IBM Defendants to identify and correct each and every one of the blatant misrepresentations and self-contradictions contained in Rosen's Opposition and supporting papers.[2] These factual disputes are *immaterial* for summary judgment purposes, and the Court need not address them further.

By focusing so heavily on the communications about the LOP, Rosen's Opposition almost completely ignores the significant threshold issue of whether Rosen was contractually entitled to *any* commissions on sales "influenced" by Torrent Systems ("Torrent") in 1999 under the terms of his 1999 Plan and Torrent's Independent Software Vendor ("ISV") Contract with IBM – irrespective of the LOP. This forms the crux of the IBM Defendants' summary judgment argument on Counts Fourteen

---

[2] The IBM Defendants will, however, point out some of the more egregious ones throughout this Reply Memorandum -- only to demonstrate the gross liberties Rosen has taken with the record in this case. Perhaps the most jaw-dropping misrepresentation in Rosen's Opposition is the assertion that "Rosen never received written notice of the application of the LOP until December of 1999" – citing Dale Rebhorn's so-called "Final Report" as "evidence." See Rosen's Opposition at 18; id. at 10; Affidavit of Richard Bieder ("Bieder Aff."), Exhibit 9. This blatantly contradicts Rosen's deposition testimony that, when he received the December 1999 copy of the Plan from Schieve, "there was nothing here that was new," as Rosen received written notice of the LOP *back in August or September of 1999* when Schieve instructed him to download the revised BDM Plan template containing the LOP. See Deposition of Nathan Rosen ("Rosen Depo.") at 29-31 (attached to Stekloff Aff. as Exhibit 1). Faced with this admission, Rosen was forced to further concede during his deposition that his "Open Door" representation to Rebhorn that December 1999 "was the first time I saw the revised sales plan" was simply not true. See Rosen Depo. at 68-69 (Q: And this wasn't true, was it? A: I think I miswrote here because I had told Rebhorn – I miswrote here because I'd seen and I had mentioned that I had seen it. And I had also seen it in the large opportunity process – I mean, in the template . . . Q: My statement is not whether you meant it or not. A: This is incorrect, yes.") (relevant portions attached to Stekloff Reply Aff. as Exhibit 27); Rosen Deposition Exhibit 5, at D283 (relevant portions attached to Stekloff Reply Aff. as Exhibit 30). It is therefore appalling that Rosen's Opposition cites Rebhorn's report as "evidence" that Rosen did not receive written notice of the LOP until December 1999 – as Rebhorn's finding to that effect is based on *admittedly untruthful information provided to him by Rosen.*

and Fifteen of the Complaint as those counts pertain to both the LOP and Citibank Subscription issues.[3]

Rosen's decision to largely ignore this argument is understandable, as the undisputed facts demonstrate

that Rosen had no contractual entitlement under his Plan to commissions on any Torrent-influenced

sales in 1999, including specifically the Citibank Subscription, because, as explained below, such

"influence" sales were outside the scope of Torrent's Direct License Agreement ("DLA") contract with

IBM.

> 1.  **Counts Fourteen and Fifteen Fail As A Matter of Law as They Pertain to the LOP and Citibank Subscription Because It is Undisputed That Torrent Signed a DLA Contract Requiring it To Directly Sell A Combined Torrent/IBM Software Product And All Torrent 1999 Sales In Issue Here Were "Influence" Sales.**

Counts Fourteen and Fifteen fail as a matter of law as they pertain to the LOP and

Citibank Subscription because Rosen has not disputed, and cannot dispute, the following four material

facts:

> (1)  Under Rosen's 1999 Plan, he was contractually entitled to receive revenue credit for, and to be paid commissions on "Billed Software Revenue" that was "within the scope of the ISV contract for each account." See the Plan, at Bates No. 000247 (attached to Bieder Aff. as Exhibit 10); Rosen Depo. at 184-85 (attached to Stekloff Aff. as Exhibit 1).

> (2)  Torrent's ISV Contract in 1999 was structured as a DLA, which required Torrent to actually purchase database software directly from IBM, either bundle or embed that IBM software with Torrent's own software product to create a new, combined software product, and then to directly sell that newly-created software product to end users. See IBM Defendants' Memorandum at 5. Specifically, in 1999, Torrent agreed to: (a) purchase a specific quantity of IBM's database software known as "DB2 UDB EEE"; (b) combine that software with Torrent's "Orchestrate" software product to create a *new* product (or "SKU"); and (c) generate $391,989 in DLA sales of the newly-created SKU incorporating DB2 UDB EEE and Orchestrate. See id. at 5-6. Compare IBM Defendants' L.R. 56(a)(1) Statement, ¶¶13-15, with Rosen's L.R. 56(a)(2) Statement, ¶¶13-15

---

[3] The IBM Defendants will separately address the legal defects in Rosen's claim in Count Fifteen under Conn. Gen. Stat. §31-72 with respect to the $4127.13 retroactive adjustment. See Section II.A.3, infra, at 13-14.

(3)    Torrent did not make *a single direct sale* in 1999 of the combined Torrent/IBM software product identified in Torrent's ISV Contract. <u>Compare</u> IBM Defendants' L.R. 56(a)(1) Statement, ¶21-22, <u>with</u> Rosen's L.R. 56(a)(2) Statement, ¶21-22.

(4)    The Citibank Enterprise License Agreement ("ELA"), like *all* other sales on which Rosen seeks additional commissions in this lawsuit, was an "influence" sale which closed on September 30, 1999 – as Citibank purchased Torrent's "Orchestrate" product from one source, and then purchased IBM's database software separately from another source. <u>Compare</u> IBM Defendants' L.R. 56(a)(1) Statement, ¶18, <u>with</u> Rosen's L.R. 56(a)(2) Statement, ¶18. In other words, Citibank did not directly purchase, from Torrent, the newly-created, combined Torrent/IBM software product as specified in Torrent's 1999 ISV Contract.[4] <u>Id.</u>

These four undisputed material facts are fatal to Rosen's breach of contract claims in Count Fourteen pertaining to the LOP and Citibank Subscription, as well as to Rosen's §31-72 claims in Count Fifteen, for the reasons discussed in detail in the IBM Defendants Memorandum: they conclusively establish that Torrent's "influence" sales in 1999 were not "within the scope of the ISV contract," as Torrent's ISV Contract required it to develop and directly resell a newly-created, combined Torrent/IBM software product. Consequently, these "influence" sales, including the Citibank Subscription, do not fall within the definition of "PCO1 Billed Revenue" under Rosen's plan – meaning that he has no contractual right under the Plan to be paid commissions for them.[5] <u>See</u> IBM Defendants'

---

[4] Rosen also does not dispute that "when [IBM] put the contract together with Torrent, the contract commitment was based on licensing only," *not* subscription. <u>See</u> IBM Defendants' Memorandum at 10, 32 n.14 (quoting Rosen Depo. at 190-91). This provides an independent basis for summary judgment with respect to the Citibank Subscription component of Counts Fourteen and Fifteen. <u>Id.</u>

[5] Rosen asserts that Ferris testified that Torrent was contractually entitled to claim "influence" revenue for the Citibank Subscription. <u>See</u> Rosen's Opposition at 23 n.13. Rosen conveniently leaves out the *very next lines* of Ferris's testimony, where Ferris stated that "I don't know that for a fact" because it was not his job to keep track of which sales are within the scope of which governing ISV contract. <u>See</u> Deposition of Joe Ferris ("Ferris Depo.") at 23-24 (relevant portions attached to Stekloff Reply Aff. as Exhibit 28). <u>See also id.</u> at 30-31 ("Q: How do you determine if it counts? A: If its part of the makeup of the revenue objective that was put in their contract. Q: Whose contract? A: Torrent's contract . . . . That's John Schieve's job. That's not my realm. Its not my scope. Q: Did you rely on John Schieve to say whether it counted? A: That would be his job, yes.").

-4-

Memorandum at 29-32, 35-36. This is a pure question of law based on the definitive, undisputed language of the relevant contracts, e.g., the Plan and Torrent's ISV Contract, and the four undisputed facts set forth above. See Levine v. Massey, 232 Conn. 272, 277-78 (1995) ("where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law").

Because Rosen has no contractual right under his Plan to additional commissions with respect to the LOP or Citibank Subscription, he has no legal right to them under Conn. Gen. Stat. §31-72 either. Section 31-72 merely provides a remedy when an employer fails to pay an employee their agreed-upon wage; it does not create a substantive entitlement to any specific wage (other than minimum wage). See Mytych v. May Dept. Stores Co., 260 Conn. 152, 161-63 (2002) (§31-72 "does not embody substantive standards to determine the amount of wages that are payable . . . [it] provide[s] remedial protections for those cases in which the employer-employee wage agreement is violated"); Shortt v. New Milford Police Dept., 212 Conn. 294, 308-09 (1989) (§31-72 is a "remedial statute rather than one creating independent substantive rights").[6] Counts Fourteen and Fifteen thus fail as a matter of law as they pertain to the LOP and Citibank Subscription.

2.    **Each of Rosen's Arguments in Opposition to Summary Judgment on Counts Fourteen and Fifteen Pertaining to the LOP and the Citibank Subscription Is Unavailing In Light of the Undisputed Facts and Definitive Contract Language.**

Although not a model of clarity, Rosen's Opposition appears to advance three principal arguments as to why his breach of contract and §31-72 claims pertaining to the LOP and the Citibank

---

[6] Rosen challenges the notion that his breach of contract and §31-72 claims must stand or fall together, asserting that the IBM Defendants' argument to that effect is "circular." See Rosen's Opposition at 34 (citing Linker v. Koch Investments, 62 F. Supp.2d 611, 612-13 (D. Conn. 1999)). Mytych and Shortt, discussed above, demonstrate that Rosen's is simply wrong, as his §31-72 claim is only viable if he has a substantive, contractual entitlement to the additional commissions he seeks under his Plan. Linker is nothing more than an example of a completely factually inapposite case where both claims survived because there were disputed facts as to whether there was a contractual entitlement to the wages sought.

-5-

Subscription should survive. For the following reasons, none of these arguments rescue Counts

Fourteen and Fifteen from summary judgment.

> a. **Rosen's Assertion that the IBM Defendants Rely on the "Wrong Plan" Is Nothing More than A Cynical Attempt to Distract the Court, As He Does Not Dispute The Definition of "PCO1 Billed Revenue" Under the Plan.**

First, Rosen's Opposition asserts at great length that the IBM Defendants rely on the

"wrong plan" in their summary judgment papers. See Rosen's Opposition at 6-10, 26-31. Indeed,

Rosen makes a point of "proving" that the so-called "Original Sales Plan" did not contain the LOP. Id.

This is puzzling – and of no assistance to Rosen in overcoming summary judgment – because the IBM

Defendants have never disputed this fact. Compare Rosen's Opposition at 26-28 with IBM Defendants'

Memorandum at 6.

Rosen also repeatedly asserts that the so-called "Original Sales Plan" did not contain a

disclaimer giving IBM the right to modify the Plan. See Rosen's Opposition at 28-30. This assertion

directly contradicts Rosen's sworn deposition testimony, where he testified that he understood at all

times that IBM reserved the right to modify his Plan. See Rosen Depo. at 23-24 (attached to Stekloff

Aff. as Exhibit 1). Moreover, just prior to that admission, Rosen authenticated Rosen Deposition

Exhibit 1A – the first page of his *original quota letter that was sent before the LLP [sic] was included*"

– which he admits receiving *in February 1999*. See id. at 23 (emphasis added); Rosen Deposition

Exhibit 1A, Rosen's original, pre-LOP Plan (attached to Stekloff Reply Aff. as Exhibit 31).

Significantly, the "original quota letter" that Rosen testified having received in February 1999 contains

the precise disclaimer that Rosen's Opposition now asserts never existed. Id.[7] This is yet another

example of the gross liberties Rosen has taken with the record.

In any event, Rosen's "wrong plan" argument is a classic "red-herring" that is completely

immaterial for summary judgment purposes because the IBM Defendants do not rely on either the LOP

language or the disclaimer allowing IBM to modify Rosen's Plan. Rather, the IBM Defendants rely on

the definition of "PCO1 Billed Revenue" in the Plan, which provides that Rosen is contractually entitled

to receive commissions on only those software sales that are "within the scope of the ISV Contract for

each account." Every single version of the 1999 Plan in the record contains this same definition –

including the December 8, 1999 version which, according to Rosen himself, included "nothing new."

See Rosen Depo. at 29; Stekloff Aff., Exhibit 4; Bieder Aff., Exhibit 10; Stekloff Reply Aff., Exhibit 32.

Rosen has never disputed this and, therefore, his "wrong plan" argument is nothing but an attempt to

distract the Court from the real issue at hand:  whether he is contractually entitled to the additional

commissions he seeks with respect to Torrent's "influence" sales under his Plan and, in turn, under §31-

72. As set forth above, he is not.

**b.    Rosen's Assertion That IBM Had a "Standard Practice" of Paying BDMs Commissions on "Influence" Sales Even Under DLA Contracts Fails As a Matter of Law To Create a Contractual Obligation on IBM's Part to Pay Commissions on All Such Sales.**

Rosen's second argument in opposition to summary judgment on Counts Fourteen and

Fifteen as those counts pertain to the LOP and Citibank Subscription issues is that "influence" sales

---

[7] To the extent that Rosen's August 14, 2003 Affidavit ("Rosen Aff.") appears to directly contradict his sworn deposition testimony on this issue, the Court should disregard his subsequent Affidavit. Compare Rosen Depo. at 23-24 (discussing Deposition Exhibit 1A, his "original quota letter" received in February 1999, with disclaimer) and Stekloff Reply Aff., Exhibit 32, at D122-23 (Rosen's pre-LOP Plan) with Rosen Aff., ¶2 (asserting that "Original Sales Plan" received in February 1999 did not have disclaimer). See Bickerstaff v. Vassar College, 196 F.3d 435, 455 (2d Cir. 1999) (noting that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony") (additional citations omitted).

actually *were* considered to be "within the scope of Torrent's DLA Contract," because IBM had a "standard practice" of paying commissions on "influence" sales under DLA contracts. See Rosen's Opposition at 22, 32. As evidence of this alleged "standard practice," Rosen points to one e-mail authored by IBM employee Robert Courtney in *December 2000*, long after Rosen had left IBM, which provided, among numerous other things, that "DLA ISVs can, and do, report influence revenue against their Direct Revenue" contracts." See Bieder Aff., Exhibit 28. Rosen also states that he was previously paid commissions based on sales "influenced" by one of his other DLA ISVs, Complex Systems Inc., ("CSI"). See Rosen's Opposition at 22.

This argument is misplaced because the IBM Defendants have never disputed that DLA ISVs *can* and *do* report "influence" revenue, nor that Rosen received commissions with respect to such "influence" sales in the past. Indeed, Torrent itself *could* and *did* report "influence" revenue with respect to the Citibank ELA which closed on September 30, 1999, in which Citibank purchased 232 licenses of IBM database software from a software reseller – not directly from Torrent as part of the combined Torrent/IBM offering specified in Torrent's DLA Contract. See IBM Defendants' Memorandum at 8. IBM nonetheless approved revenue credit for Torrent and Rosen for the license component of the Citibank ELA on an exception basis – something Rosen acknowledged during his deposition. See IBM Defendants' Memorandum at 8, 32-33. The fact that DLA ISVs "can and do" report "influence" sales is simply not a disputed material fact for summary judgment purposes.

Rosen's argument does, however, raise the legal question as to whether IBM's "standard practice" of paying commissions on "influence" sales when the governing ISV contract called for direct DLA sales (assuming for summary judgment purposes that IBM had such a "practice") creates a *contractual obligation* under which IBM *must* pay commissions on all such sales. This is where Rosen's "standard practice" argument falls apart because, under Connecticut law, contractual

-8-

obligations "are not created by evidence of customs and usage." Reynolds v. Chrysler First Commercial Corp., 40 Conn. App. 725, 732-33 (1996) (rejecting as matter of law plaintiff's argument that employer's "routine" and "customary" use of progressive disciplinary measures created contractual obligation to utilize such measures before terminating plaintiff); Christensen v. BIC Corp., 18 Conn. App. 451, 454-56 (1989) (holding that employer's custom and practice of paying annual performance-based bonus did not create a contractual entitlement whereby employer must pay bonus to discharged plaintiff); Cardona v. Aetna Life & Cas., No. 3:96CV1009(GLG), 1998 WL 246634, at *6-7 (D. Conn. May 8, 1998) (following Reynolds and declining to find contractual obligation to employ progressive discipline procedures notwithstanding that such procedures were "defendant's usual and customary practice") (attached to Stekloff Reply Aff. as Exhibit 34); Tyskiewicz v. Aaron Manor, Inc., No. CV970081800S, 1998 WL 323434, at *3-4 (Conn. Super. June 9, 1998) (rejecting claim that employer's "practice of using progressive discipline" bestowed plaintiff with contractual entitlement to progressive discipline) (attached to Stekloff Reply Aff. as Exhibit 39); Ansonia Mall Assoc., Ltd. v. First Nat'l Supermarkets, Inc., No. CV89028884S, 1990 WL 272033, at *3-4 (Conn. Super. Apr. 26, 1990) (holding that, although defendant-lessee made certain regular payments to plaintiff-lessor over course of two-year period that were not technically required under the lease, plaintiff had no contractual entitlement to continue collecting such payments) (attached to Stekloff Reply Aff. as Exhibit 33).

Christensen is particularly analogous here. Christensen worked for BIC from 1975 through December 1983, and he received a performance-based bonus every year that he worked there except for his final year, 1983. Christensen, 18 Conn. App. at 452. Christensen alleged that BIC had a "custom, practice and policy" of paying an annual bonus based on the company's performance – and that this "custom, practice and policy" created a contractual entitlement giving rise to a legal right to collect his 1983 bonus (which would have been paid in March 1984) even after his December 1983

termination. Id. at 453. The Appellate Court rejected this argument, noting that, absent any actions from BIC indicating a desire to make a contractual commitment to plaintiff to pay the bonus, "the fact that in previous years BIC had given the plaintiff a bonus does not create a contract. . . ." Id. at 455.

Ansonia Mall Associates ("AMA") is also insightful. In that case, plaintiff leased space in its shopping center to defendant, who operated a grocery store. AMA, 1990 WL 272033, at *1. In addition to rent, the lease required defendant to pay a monthly proportional share (15%) of certain common maintenance charges, including electricity bills. Id. at *2-3. Plaintiff, however, had been charging defendant for 50% of the shopping center's electricity bills for Sundays only, under the theory that defendant's store was one of only a few stores in the center open on Sundays. Id. at *2. For more than two years, and without objecting, defendant paid plaintiff's monthly bills which included the 50% electricity charge for Sundays. Id. at *3. Nevertheless, when the defendant breached the lease and the plaintiff sued to collect advance rent and expenses, including the 50% Sunday electricity charge, the Court held that:

> the fact that the defendants made payments between September 1985 and July 1987 in accordance with the plaintiff's understanding of the arrangement, and invoices submitted by it, also does not create a contract unless it was shown that this was a result of a contractual commitment by the defendants, since *contracts are not created by evidence of custom and usage.*

Id. at *4 (emphasis added).

The Christensen and AMA rationale applies with full force here. The fact that IBM may have voluntarily paid Rosen commissions on certain Torrent "influence" sales outside the scope of the governing DLA contract does not by itself create a *contractual obligation* whereby IBM *must* pay Rosen commissions on all such sales. Consequently, even assuming that IBM had such a "standard practice," this is insufficient as a matter of law to bestow upon Rosen a contractual entitlement to be paid the additional commissions he seeks with respect to the LOP and Citibank Subscription.

-10-

c.    **Rosen's Errata Sheet Does Not Create A Disputed Issue of Material Fact on These Claims, Nor May He Use The Errata Sheet To "Retract" His Prior Admissions That He *Knew* He Was Being Paid For "Influence" Sales on an "Exception Basis."**

Rosen's third and final attempt at saving his breach of contract and wage claims in Counts Fourteen and Fifteen is his remarkable assertion that he created an issue of fact when he submitted an errata sheet purporting to "retract" his clear and unambiguous deposition testimony that he actually *understood at the time* that: (a) "influence" sales were outside the scope of Torrent's DLA Contract; (b) he was being paid for all such sales on an "exception basis"; and, therefore (c) he wanted to change the contract to make sure he was paid "contractually" and not by exception. Compare Rosen's Opposition at 31-32 with IBM Defendants' Memorandum at 32-33 (quoting extensively from Rosen's Deposition); see also Rosen's Errata for December 5th Deposition, at 8-11, 13, 14-15 (attached to Stekloff Aff. as Exhibit 2). Rosen, of course, seeks to "replace" his contemporaneous testimony with the hindsight-aided excerpt quoted in the IBM Defendants' Memorandum at 33.

Rosen is incorrect as an initial matter that IBM "acknowledges" that Rosen's errata sheet creates a disputed issue of material fact. See Rosen's Opposition at 33. The IBM Defendants expressly argued to the contrary: that, even if the Court considers it, Rosen's errata sheet fails to create a genuine issue of material fact because it does not change two critical undisputed facts, namely that: (a) Torrent's Contract is clearly, on its face, a DLA Contract requiring Torrent to sell a newly-created, combined Torrent/IBM software offering directly to end customers; and (b) *all* of Torrent's 1999 sales for which Rosen seeks commissions in this lawsuit, including the Citibank Subscription, were "influence" sales where, rather than buying the newly-created, combined Torrent/IBM product directly from Torrent, the end user separately purchased Torrent's product and IBM's product from other sources. See IBM Defendants' Memorandum at 34. Because Rosen still does not dispute these critical facts, his errata

-11-

sheet does not help him. To the contrary, it is simply irrelevant given the definitive contract language. See id. at 30-31 (discussing Levine and related cases).

Rosen is also incorrect as a matter of law that he may use his errata sheet to "retract" his highly-damaging deposition admissions that he understood at the time that "influence" sales were outside the scope of Torrent's DLA Contract and that he was being paid for all such sales on an "exception basis." This proposition comes directly from the Second Circuit's decision in Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 102-04 (2d Cir. 1997) – a case cited in Rosen's Opposition at 32. Although Rosen cites Podell for the proposition that substantive changes to a deposition transcript are permissible, see Rosen's Opposition at 32, Rosen overlooks the actual holding of Podell: that plaintiff was "*not* entitled to have his altered answers take the place of the original ones," but rather that both answers remain part of the record. See Podell, 112 F.3d at 103 (emphasis added). The Second Circuit held that the district court properly considered Podell's *original* deposition answers in applying a "totality of the evidence standard," which resulted in summary judgment for the defendant notwithstanding a similarly self-serving, hindsight-aided errata sheet that contradicted plaintiff's contemporaneous deposition testimony. Id.

Podell therefore precludes Rosen from "retracting" his contemporaneous admissions that he *knew* he was being paid on an "exception basis" for "influence" sales outside the scope of Torrent's

-12-

ISV Contract and "replacing" those admissions with his self-serving, hindsight-aided missive.[8]  When

the Court considers the plain language in Rosen's Plan and in Torrent's ISV Contract, together with

Rosen's original deposition admissions, there is no genuine issue of material fact to be tried.  Rosen has

no contractual entitlement under his Plan to commissions on "influence" sales outside the scope of

Torrent's DLA Contract – something he knew and understood during his deposition in this case, when

he acknowledged that IBM had paid him for all such sales on an exception basis.

Summary judgment is therefore appropriate on Counts Fourteen and Fifteen as those

counts pertain to the LOP and Citibank Subscription, as Rosen, by definition, cannot be contractually

entitled to a further exception.  That disposes of Count Fourteen in its entirety, which pertains only to

these two issues, leaving only Count Fifteen as it pertains to the $4127.13 retroactive adjustment.

3.  **Count Fifteen Also Fails As It Pertains to the $4127.13 in Retroactive Adjustment, As Rosen's Opposition Does Not Even Address This Issue, Let Alone Raise a Disputed Issue of Material Fact to Be Tried.**

Rosen's Opposition does not even address the IBM Defendants' summary judgment

motion on Count Fifteen as it pertains to the $4127.13 retroactive salary adjustment, which is based on

Rosen's sworn deposition testimony and the Affidavit of Rod Graham ("Graham Aff."), Rosen's

supervisor at the time Rosen voluntarily resigned from IBM in 2000.  See IBM Defendants'

Memorandum at 12-13, 37 (discussing Rosen's deposition testimony on the $4127.13 and the Graham

---

[8] Podell is thus not inconsistent with the increasing number of decisions applying a "sham affidavit" analysis in holding that a party may not erase the effects of damaging deposition testimony on summary judgment simply by submitting a timely errata sheet which directly contradicts the original testimony. See Thorn v. Sundstrand Aerospace Corp., 207 F.3d 383, 389 (7th Cir. 2000) (explaining that, while Rule 30(e) authorizes "changes in form or substance," "a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'").  See also Burns v. Bd. of Cty. Comm'rs of Jackson Cty., 330 F.3d 1275, 1281-82 (10th Cir. 2003) (affirming summary judgment in employment discrimination case where district court relied on plaintiff's original deposition admissions notwithstanding the fact that plaintiff had submitted a timely errata sheet purporting to change such testimony).

Aff.). Summary judgment is thus appropriate on Count Fifteen as it pertains to the $4127.13, as that

sum was not "payment in exchange for services rendered" by Rosen but rather the net effect of a

retroactive salary adjustment, initiated by Graham *after* Rosen voluntarily resigned from IBM in August

2000, that was designed to ensure that Rosen did not have to repay IBM the $1236 commissions

advance he had taken. See IBM Defendants' Memorandum at 37. The $4127.13 is therefore not

"wages" under Conn. Gen. Stat. §§31-71(a)(3) and 31-72, and the IBM Defendants are entitled to

summary judgment on this issue. Id.

**B.    Rosen's Opposition Raises No Genuine Issue of Material Fact to Be Tried On His Claims for "Statutory Theft" Under Conn. Gen. Stat. §52-564, Warranting Summary Judgment on Counts Two, Seven, Ten and Eleven of the Complaint.**

Two undisputed material facts prove fatal to Rosen's "statutory theft" claims under Conn.

Gen. Stat. §52-564 with respect to the LOP (Count Two), the Citibank Subscription (Count Seven) and

the $4127.13 retroactive adjustment (Count Eleven):

(1)    Rosen expressly admits that he never received *any* of this money which, instead, has at all times remained the fungible property of IBM. Compare IBM Defendants' Memorandum at 23-25 with Rosen's Opposition at 42-46. Compare also IBM Defendants' L.R. 56(a)(1) Statement, ¶¶34-37, with Rosen's L.R. 56(a)(2) Statement, ¶¶34-37. [9]

(2)    The basis for Rosen's claim of right to the money is that he believes that IBM has wrongfully refused to pay him under his Plan. Id.

Given these undisputed facts, Rosen cannot demonstrate that he was or is the "owner" of

this money under Conn. Gen. Stat. §52-564, as he must in order to maintain a statutory theft claim. See

---

[9] Rosen's L.R. 56(a)(2) Statement appears to be mis-numbered such that it does not correspond directly to the IBM Defendants' L.R. 56(a)(1) Statement but rather is "one number off" – at least with respect to these particular paragraphs. When Rosen's L.R. 56(a)(2) Statement is placed alongside the IBM Defendants' L.R. 56(a)(1) Statement, it is readily apparent that Paragraphs 35-37 of Rosen's L.R. 56(a)(2) Statement *actually* correspond to Paragraphs 34-36 of the IBM Defendants' L.R. 56(a)(1) Statement – demonstrating that Rosen admits that he never received the commissions he seeks with respect to the LOP, the Citibank Subscription or the $4127.13 in retroactive adjustment. Rosen's Opposition does not assert to the contrary.

-14-

Suarez-Negrete v. Trotta, 47 Conn. App. 517, 520-21 (1998) (noting that §52-564 "statutory theft" is synonymous with "larceny" under §53a-119 and requires a showing that a person "with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property *from an owner*") (emphasis added).

Notwithstanding Rosen's half-hearted attempt to distinguish them as "unpaid bill" cases (whatever that means), Rosen's Opposition says nothing of substance about the long line of Connecticut authority cited in the IBM Defendants' Memorandum holding that, where the defendant has at all times retained possession of the money that the plaintiff claims he is owed, and the plaintiff's claim is that the defendant owes the money pursuant to a contract between the parties, the plaintiff is not the "owner" of that money for purposes of the theft statute and has no cause of action under §52-564. Compare IBM Defendants' Memorandum, at 24-25 (discussing New Horizon Fin. Serv. v. First Fin. Equities, 175 F. Supp.2d 348, 351, 354-55 (D. Conn. 2001); Robinson v. Van Dyck Printing Co., No. CV940360526S, 2000 WL 573168, at **3-4 (Conn. Super. April 25, 2000) (attached to Stekloff Aff. as Exhibit 24); and Delta Capital Group LLC v. Smith, No. CV970571407S, 1998 WL 167293, at *4 (Conn. Super. Mar. 31, 1998) (attached to Stekloff Aff. as Exhibit 20), among other cases) with Rosen's Opposition, at 42-46. These cases are directly on point and dispositive in light of the undisputed facts here that IBM has

retained possession at all times of the money Rosen claims he is owed and Rosen's claim is that he is

entitled to it under the Plan.[10]

Accordingly, summary judgment should be granted on the "statutory theft" claims

alleged in Counts Two, Seven, and Eleven of the Complaint. Summary judgment should also be granted

on the "aiding and abetting" claim against Ferris in Count Ten.[11]

**C.    Summary Judgment Should Be Granted On Count Six Because Connecticut Does Not Recognize a Cause of Action for "Negligent Investigation" In the At-Will Employment Context.**

In opposition to the IBM Defendants' summary judgment motion on Count Six of the

Complaint, Rosen neither explains how his "general" negligence claim against Schieve and IBM with

respect to the LOP differs from his negligent misrepresentation claim in Count Four, see Section II.D

infra, at 19-25, nor comes forward with any facts demonstrating that he was owed a duty of care by IBM

as an at-will employee. Compare IBM Defendants' Memorandum at 27-29 with Rosen's Opposition at

40-42. Accordingly, summary judgment should be granted on Rosen's "general" negligence claim in

---

[10] Rosen attempts to distinguish Vekris v. Pass, No. CV9101-1005, 1991 WL 270278 (Conn. Super. Nov. 18, 1991) (attached to Stekloff Aff. as Exhibit 26), on the grounds that the factual allegations here are supposedly more egregious than in Vekris. Compare Rosen's Opposition at 45 with IBM Defendants' Memorandum at 25-26. In so doing, Rosen misses the central holding of Vekris and the reason that the IBM Defendants rely on it here: that it is inconceivable that the Connecticut legislature intends to permit claims for "statutory theft" under §52-564 in each instance where an employee is embroiled in a wage dispute with his employer, especially considering that the legislature has enacted a specific statute, §31-72, with a different remedial provision, for precisely that situation. The Connecticut Supreme Court has made clear that "specific terms covering the given subject matter will prevail over general language of the same or another statute which might otherwise prove controlling." Oles v. Furlong, 134 Conn. 334, 342 (1948).

[11] Count Ten of the Complaint alleges the "aiding and abetting" of "statutory theft" against Ferris individually with respect to the Citibank Subscription issue in Count Seven. Count Ten thus fails as a matter of law, as "[a] civil action of aiding and abetting cannot stand alone and depends upon the existence of a valid underlying cause of action." See Fink v. Magner, 988 F. Supp. 70, 72 (D. Conn. 1997) (citing Marshak v. Marshak, 226 Conn. 652, 668 (1993), overruled on other grounds, State v. Vakilzaden, 251 Conn. 656 (1999)) (internal quotations omitted). Ferris should therefore be dismissed as a defendant, as Count Ten is the only claim against him in the Complaint.

Count Six for the unrebutted reasons set forth in the IBM Defendants' Memorandum. In case after case, Connecticut courts have rejected the notion that employers owe a "general" duty of care to employees with respect to activities occurring in the normal course of the employment relationship. See IBM Defendants' Memorandum at 28-29 (citing cases).

Instead, Rosen tries to repackage his negligence claim in Count Six as a "negligent investigation" claim against Rebhorn and IBM based on Rebhorn's "Open Door" investigation.[12] See Rosen's Opposition at 40-42. Connecticut, however, does not recognize a cause of action for "negligent investigation" in the at-will employment context. The seminal case demonstrating this is Morris v. Hartford Courant Co., 200 Conn. 676, 680-81 (1986), in which the Supreme Court held that an at-will employee had no cause of action against his employer based solely on allegations that the employer was negligent in failing to "reasonably and adequately" investigate charges that the employee misappropriated company funds before terminating him. The District of Connecticut has followed Morris in rejecting similar negligence claims, as have numerous Connecticut Superior Courts. See, e.g., White v. Martin, 23 F. Supp.2d 203, 207 (D. Conn. 1998) (dismissing plaintiff's claims of negligence in employment context following Morris); Johnson v. Chesebrough Pond's USA, 918 F. Supp. 543, 551 (D. Conn. 1996) (following Morris and dismissing claim that "defendant was negligent in failing to

---

[12] Rosen asserts that Count Six pleads a negligent investigation claim against Rebhorn notwithstanding that: (a) Rebhorn is not named as a defendant in the heading of Count Six; and (b) Count Six does not incorporate any of the factual allegations in the Complaint pertaining to Rebhorn or to the "Open Door." Compare Count Six, ¶¶1-31 (incorporating Paragraphs 1-31, all of which pertain to the LOP communications) with ¶¶49-63 of Section on Parties and Background Facts (pertaining to Rebhorn and the "Open Door"). See Rosen's Opposition at 40-41 n.22. Given the clarity with which every other Count of the Complaint identifies the specific defendant(s) in its heading, and given the fact that every other Count expressly incorporates the specific, relevant factual allegations, the IBM Defendants submit that it is certainly not apparent on the face of the Complaint that Count Six even purports to state a negligent investigation claim against Rebhorn and IBM based on the "Open Door" investigation. Summary judgment should be granted on Count Six on that alternative basis as well.

follow its own procedures"); <u>Guarco v. Hartford Gynecological Ctr.</u>, No. CV9868084S, 2000 Conn. Super. LEXIS 2710, at *1-3 (Conn. Super. Oct. 10, 2000) (citing <u>Morris</u> for proposition that employer owes "no duty to investigate with care" with respect to at-will employee) (collecting cases) (attached to Stekloff Reply Aff. as Exhibit 36); <u>Menard v. People's Bank</u>, No. CV970544627S, 1998 Conn. Super. LEXIS 965, at *12-13 (Conn. Super. Apr. 6, 1998) (striking "negligent investigation" claim pursuant to <u>Morris</u>, as "an employer does not have an obligation to investigate" with respect to an at-will employee) (attached to Stekloff Reply Aff. as Exhibit 38); <u>Daley v. Aetna Life & Cas.</u>, No. CV940533693S, 1994 Conn. Super. LEXIS 1994, at *14-15 (Conn. Super. Aug. 3, 1994) (striking "negligent investigation" claim because employer "does not owe the [at-will] employee a duty to investigate [and] therefore it cannot be held liable for negligent investigation") (attached to Stekloff Reply Aff. as Exhibit 35); <u>Wormley v. Blue Cross & Blue Shield</u>, No. CV314088, 1992 Conn. Super. LEXIS 3405, at *5-6 (Conn. Super. Nov. 23, 1992) (dismissing negligent investigation claim under <u>Morris</u> because of the absence of a duty of care) (attached to Stekloff Reply Aff. as Exhibit 40).[13]

Rosen relies heavily on <u>Ibamatic Corp. v. United Technologies, Inc.</u>, No. CV96337099, 2002 WL 1842977 (Conn. Super. July 16, 2002) (attached to Stekloff Reply Aff. as Exhibit 37), in support of his negligent investigation claim. <u>See</u> Rosen's Opposition at 41-42. <u>Ibamatic</u>, however, is completely distinguishable in that the Court's entire holding on the negligent investigation claim hinges on the threshold finding that plaintiff was *not* an at-will employee but rather a party to an "arms length

---

[13] The <u>Morris</u> rationale prohibiting claims for negligent investigation also makes sense as a matter of policy. Indeed, if employers can incur negligence liability for their conduct in investigations that they are under no legal obligation to perform, the predictable result is that employers will simply stop conducting such voluntary investigations. Worse yet, if individual employees can incur personal liability with respect to their conduct as investigators, it will be exceedingly difficult for employers to find employees willing to serve in this role. This would be unfortunate, as voluntary, internal investigation procedures like IBM's "Open Door" process likely resolve a fair amount of employer-employee disputes before such disputes erupt into lawsuits and further burden the courts.

commercial contract." Ibamatic, 2002 WL 1842977, at *3 . In fact, Ibamatic argued that Morris was inapplicable because Ibamatic was *not* an employee of UTI but rather an independent contractor, and the Court acknowledged that plaintiff's negligent investigation claim would have been foreclosed by Morris *if* plaintiff had been an employee. Id. Only after finding that the Morris "employer-employee cases are inapposite" did the Ibamatic Court hold that a negligent investigation claim was cognizable on the facts. Id. at *4. Ibamatic is therefore of no assistance to Rosen here.

For all of these reasons, Count Six fails as a matter of law – whether it is a "general" negligence claim based on the LOP issue or a "negligent investigation" claim based on the "Open Door." Summary judgment should therefore be granted.[14]

**D.**    **Rosen's Fraudulent and Negligent Misrepresentation Claims in Counts One and Four, Respectively, Fail As a Matter of Law Because Rosen Cannot Demonstrate Detrimental Reliance In Light of His Sworn Deposition Testimony.**

Rosen's Opposition employs two last-ditch strategies in an attempt to save his fraudulent and negligent misrepresentation claims in Counts One and Four of the Complaint, respectively. The first is to directly contradict Rosen's sworn deposition testimony on the issue of whether it actually was Rosen's job responsibility to push Torrent to report its 1999 "influence" sales in a timely manner, before the 1999 books closed. See Rosen's Opposition at 37-38. The second is to rely on an Affidavit from a

---

[14] Although immaterial for summary judgment purposes, Rosen grossly misrepresents Rebhorn's testimony when he asserts that Rebhorn deemed Schieve's statements to be "white lies" and/or "fishy." See Rosen's Opposition at 41 (citing Rebhorn Depo. at 204). What Rebhorn actually said was, in response to a *hypothetical* question asking whether he thinks that "dishonesty is a very bad thing," that "sometimes we tell white lies." See Rebhorn Depo. at 163 (relevant portions attached to Stekloff Reply Aff. as Exhibit 29). Rebhorn never testified that Schieve nor anybody else told "white lies" with respect to Rosen. See id. at 164 ("Q: Did you recommend any penalty for Mr. Schieve as a result of this lie? [Objection interposed]. A: No. And I haven't agreed that it was a lie."). Similarly, Rebhorn never testified that Schieve's conduct was "fishy." Rather, he testified that the Citibank Subscription submission engineered by Rosen *itself* looked "fishy" given that the subscription part number Torrent submitted was "ringing up" at a substantially higher price than Citibank actually paid IBM for those subscription services. See Rebhorn Depo. at 204-05. See also IBM Defendants' Memorandum at 10-12 (explaining part number discrepancy with respect to Citibank Subscription).

third-party surprise witness who purports to opine, without any rational basis for his opinion, that

another of Rosen's ISVs would have generated an additional $2.5 million in 4Q99 sales if only Rosen

had been focusing his efforts on that ISV instead of Torrent. <u>See id.</u> at 38-40. As set forth below,

neither of these arguments create a genuine issue of material fact to be tried on the issue of detrimental

reliance on Rosen's claims in Counts One and Four.

1.    **Rosen's Attempt To Contradict His Deposition Testimony That It Was His Job To Ensure That Torrent Reported Its Sales in a Timely Manner Is Misguided, As Even His "New" Story Does Not Create A Genuine Issue of Material Fact.**

First, Rosen tries to contradict his sworn deposition testimony which establishes the

absence of detrimental reliance as a matter of law given that: (a) all of the Torrent-influenced sales in

issue actually closed in 1999; and (b) it was Rosen's responsibility as an IBM BDM to push Torrent to

report its 1999 sales in a timely manner – before the 1999 books closed after the eighth working day of

2000 ("8W") – which Rosen did:

> Q:    Weren't you required to report in revenue from a sale that an ISV influenced and that was closed in the month in which the closure actually occurred?
> A:    No.
> Q:    You were instructed that that was the appropriate procedure?
> A:    They wanted that but the ISV reports it; and traditionally, I would push them to make sure it gets done.
> Q:    *And it was your job to push them to make sure it got done; isn't that right?*
> A:    *Yes.*
> Q:    *This is what IBM told you you were supposed to do, correct?*
> A:    *IBM told us to get business booked as timely as possible.*[15]

---

[15] Rosen misrepresents that the IBM Defendants "contend that it was Rosen's job requirement to book the revenues in December of 1999." <u>See</u> Rosen's Opposition at 37. This is incorrect, as the IBM Defendants have never asserted that it was *Rosen's* job "to book the revenues," only that Rosen knew that IBM expected him, as part of his job as a BDM, to *push his ISVs* as hard as he could "to book the revenues." This is exactly what Rosen testified to in his deposition, as set forth above. To the extent that Rosen does not dispute this clarification, there is no disputed issue of fact, making summary judgment appropriate for the reasons stated in the IBM Defendants' Memorandum at 16-20.

See Rosen Depo. at 146 (attached to Stekloff Aff. as Exhibit 1) (emphasis added). See also id. at 146 (Q: "Now, in point of fact, regardless of your effort, major or otherwise, all of those deals would still have closed in the sense of IBM selling the software in 1999; isn't that right? A: Yes. Q: We've established that you had no ability to affect the timing of the sale? A: Correct.").

Under these circumstances, Rosen was not "duped" by Schieve into ensuring the timely reporting of Torrent's 4Q99 influence sales. Rather, he was carrying out his regular job responsibilities as an IBM BDM – responsibilities he was obligated to carry out regardless of whether he knew about the LOP. In other words, even had Rosen known about the LOP, he was not at liberty to shirk this job responsibility, which he knew IBM expected him to complete, merely because doing so might personally benefit Rosen. The fact that Rosen had a preexisting obligation to push Torrent to report its 4Q99 sales by 8W precludes him from demonstrating detrimental reliance as a matter of law pursuant to the line of cases cited in the IBM Defendants' Memorandum at 18-19 (discussing Goldilocks Corp. v. Ramkabir Motor Inn, No. 00-55924, 2002 WL 24562, at *2-3 (9th Cir. 2002) (attached to Stekloff Aff. as Exhibit 22), and other authority for the proposition that detrimental reliance cannot be established where the party claiming detrimental reliance was obligated to engage in the same course of conduct irrespective of the allegedly false representation).[16]

---

[16] Relying again on Linker, Rosen asserts that detrimental reliance is always a question for the jury. See Rosen's Opposition at 37. Linker says nothing of the sort and is completely irrelevant here except that, on the specific facts of that case, the negligent misrepresentation claim was permitted to proceed to trial. See 62 F. Supp.2d at 615. As the cases cited in the IBM Defendants' Memorandum demonstrate, judgment as a matter of law is appropriate on fraudulent and negligent misrepresentation claims when the undisputed facts demonstrate that the plaintiff is "in no worse [a] position" than if no misrepresentations were made. See Rosen v. Spanierman, 894 F.2d 28, 33-34 (2d Cir. 1990) (plaintiff could not establish detrimental reliance element of fraud claim where she was "in no worse [a] position" as a result of the misstatement); IBM Defendants' Memorandum at 18-19 (citing additional cases).

Notwithstanding Rosen's unambiguous deposition testimony that it was "his job" to push his ISVs "to get business booked as timely as possible," Rosen now asserts that this really was not his job after all – and that it was solely Torrent's responsibility to get its 4Q99 sales and revenue booked. See Rosen's Opposition at 37-38. Compare also IBM Defendants' L.R. 56(a)(1) Statement, ¶¶7-8 with Rosen's L.R. 56(a)(2) Statement, ¶¶7-8. To the extent that Rosen's new assertion appears to directly contradict his deposition testimony, the Court should disregard it. See Bickerstaff, 196 F.3d at 455; Millane v. Becton Dickinson & Co., 84 F. Supp.2d 282, 284 n.2 (D. Conn. 1999) ("statements in the plaintiff's Rule 9 statement [the predecessor to L.R. 56] which directly contradict his deposition testimony will not be credited").

Regardless, even if the Court considers Rosen's new position that it was solely Torrent's responsibility to ensure the timely reporting of its 4Q99 sales, there is *still* no genuine issue of material fact to be tried on the issue of detrimental reliance because Rosen does not dispute two material facts: (1) all of the Torrent 4Q99 sales in issue actually closed in calendar year 1999; and (2) Torrent's ISV Contract required Torrent to report its sales and revenue on a monthly basis. Compare IBM Defendants' L.R. 56(a)(1) Statement, ¶¶21,30 with Rosen's L.R. 56(a)(2) Statement, ¶¶21,30. Thus, taking Rosen's assertion as true for summary judgment purposes that it was solely Torrent's obligation to report, it is impossible for Rosen to demonstrate any detrimental reliance *on his part* with respect to Torrent's decision to report these sales before 8W as per its ISV Contract. Even had Rosen known about the LOP, Torrent's reporting process would be totally beyond Rosen's purview under Rosen's new version of the facts – and thus Torrent would have closed the same sales and reported them in the same manner, without assistance or "pushing" from Rosen, leaving Rosen in "no worse a position." Unless, of course, Rosen is actually suggesting that, but for Schieve's alleged misstatements about the LOP, Rosen would have gone out of his way to affirmatively induce Torrent to *delay* its monthly sales and revenue

reporting (and to breach its ISV Contract with IBM) for the sole purpose of maximizing Rosen's commissions – an argument so absurd that stating it serves to refute it.

Rosen therefore loses under either scenario. If it *was* his job responsibility to push Torrent as hard as he could to get its 4Q99 sales booked by 8W, as he testified in his deposition, he cannot demonstrate detrimental reliance because he was under a preexisting obligation irrespective of the LOP to make sure that Torrent reported those sales – an obligation Rosen fulfilled. See IBM Defendants' Memorandum at 14-20. If it was *not* his job responsibility at all and was solely Torrent's responsibility, as Rosen asserts now, see Rosen's Opposition at 37-38, then he cannot demonstrate detrimental reliance given that that all of the sales in issue closed in 1999 and that Torrent's Contract required monthly reporting irrespective of the impact on Nathan Rosen's commissions – an obligation Torrent fulfilled when it reported its 4Q99 sales before the 1999 books closed after 8W. Either way, Rosen's fraudulent and negligent misrepresentation claims in Counts One and Four fail as a matter of law, making summary judgment appropriate.

**2.    Rosen Has Not Come Forward With Any Admissible Evidence Demonstrating That He Would Have Been Able To Recruit Any New ISVs Or That His Existing ISVs Would Have Generated Additional 4Q99 Sales Had He Not Been Focusing His Efforts on Torrent.**

The centerpiece of Rosen's Opposition with respect to detrimental reliance on his fraudulent and negligent misrepresentation claims is that the Affidavit of Jeffrey Paul ("Paul Aff."), the alleged "contact person" at Sequel Technology ("Sequel"), one of Rosen's other ISV Partners in 1999, creates an issue of fact as to whether Rosen might have earned commissions on more than $2.5 million in Sequel-generated revenue in the 4Q99 if only Rosen had focused his efforts more on Sequel and less

on Torrent.[17]  See Rosen's Opposition at 39.  Paul's appearance is highly suspect at this stage given that, notwithstanding Rosen's obligations under Fed. R. Civ. P. 26(a) and numerous on-point Interrogatories served by the IBM Defendants, Rosen never disclosed Paul as someone with knowledge or information supporting his claims.  It is also questionable because Rosen himself testified that he did not neglect *any* of his ISV partners in the 4Q99.  See Rosen Depo. at 138-39 ("Q:  Did you neglect to work with other ISV partners other than Torrent to develop business?  A:  No.").  Indeed, Rosen's job was to try to make *all* of his ISV partners productive.

In any event, Rosen's belated focus on Sequel fails to create a triable issue of fact on the detrimental reliance element of his fraudulent and negligent misrepresentation claims.  This is largely because Paul's Affidavit, which opines that "had Mr. Rosen been able to provide the additional time to Sequel, I believe, with a reasonable amount of certainty, that Sequel would have exceeded its quota in 1999 (of approximately $723,000.00) and generated revenues in excess of $2.5 Million in 1999," is inadmissible and should be stricken for the reasons articulated more fully in the IBM Defendants' Memorandum of Law in Support of Their Motion to Strike the Affidavit of Jeffrey Paul, submitted herewith ("Motion to Strike").  Briefly summarized here, the Paul Affidavit contains inadmissible lay opinion testimony under Fed. R. Evid. 701 because Paul's opinion that Sequel would have generated in excess of $2.5 million is not rationally based on any perception he has as a witness and, thus, is of no assistance to the factfinder.  Instead, as Paul conceded during his deposition, he could not identify any specific things that Rosen could have done for Sequel in the 4Q99 or any specific sale that would have

---

[17] Rosen testified that he was completely unable to identify any *new* specific ISV Partners he would have recruited in the 4Q99 had he not been focusing his time exclusively on Torrent, and that he was completely unable to identify any specific sales that any potentially new ISV Partner might have closed in the 4Q99.  See IBM Defendants' Memorandum at 21.  Rosen does not dispute this, choosing instead to argue that he would have been able to generate additional 4Q99 through his other, *then-existing* ISV Partners, most notably Sequel.  Compare id. with Rosen's Opposition at 38-40.

closed but for Rosen's absence. Rather, the sole basis for Paul's $2.5 million opinion (or, more accurately, guess) is that, a few years earlier, working for a different employer (*i.e.*, not Sequel), selling a different software product, Paul worked closely with different IBM sales representatives (*i.e.*, not Rosen) and happened to generate a significant amount of sales.[18]  See Motion to Strike.

With Paul's Affidavit stricken, Rosen is left only with his own wildly speculative, unsupported conclusory assertions that some of his other ISVs might have generated some additional sales in the 4Q99 if only he had focused on those ISVs instead of on Torrent.  See Rosen's Opposition at 39-40.  For the reasons articulated in the IBM Defendants' Memorandum at 21-22, these wildly speculative assertions are insufficient as a matter of law to constitute detrimental reliance.  See id. Summary judgment is therefore appropriate on Counts One and Four.[19]

**E.    Summary Judgment Should Be Granted As to Liability on All Four of Schieve's and Rebhorn's Counterclaims Against Rosen Because Rosen Admits That He Illegally Taped Private Telephone Conversations Without Consent.**

Rosen makes no effort to contradict his deposition testimony wherein he conceded that, while at his home in Weston, Connecticut, he used a tape-recording device to secretly record at least three telephone conversations between himself and Schieve, and one telephone conversation between himself and Rebhorn, without obtaining either Schieve's or Rebhorn's consent.  Compare IBM

---

[18] Paul's $2.5 million guess is also highly suspect considering that, as of September 1, 1999, *i.e.*, before Rosen allegedly began neglecting the account, Sequel had generated only approximately $16,000 in sales -- or roughly *two percent (2%)* of its $723,000 contractual commitment – *all* of which closed in the 2Q99.  See Stekloff Aff., Exhibit 5, at D796; Bieder Aff., Exhibit 14 (confirming that all of Sequel's $16,404 in sales transpired in the 2Q99).

[19] Because none of Rosen's substantive claims survive summary judgment, his punitive damages claims in Counts Three, Eight and Twelve fail as well.  See IBM Defendants' Memorandum at 37.  Rosen's argument that his punitive damages claims should survive because the IBM Defendants "do not challenge, for purposes of this motion, the fraudulent nature of the misconduct by defendants," see Rosen's Opposition at 37, is patently absurd.  Rosen simply cannot recover punitive damages in the absence of a trial-worthy claim.

Defendants' L.R. 56(a)(1) Statement, ¶¶37-40, with Rosen's L.R. 56(a)(2) Statement, ¶¶37-40.

Compare also IBM Defendants' Memorandum at 38-40 with Rosen's Opposition at 46-47.[20]  Rosen has

therefore violated Conn. Gen. Stat. §52-570d(a) with respect to these four conversations.

   Rosen offers two arguments in opposition to summary judgment on Schieve's and

Rebhorn's Counterclaims, neither of which withstand scrutiny.  First, Rosen asserts that he did not

violate Conn. Gen. Stat. §52-570d(a) because the statute applies only to "private" conversations,

whereas Rosen secretly recorded "conversations solely address[ing] Rosen's employment at IBM."  See

Rosen's Opposition at 47.  Nothing in §52-570d(a) itself supports Rosen's sweeping argument that the

term "private" as used in the statute covers only "social" or "non-work related" conversations.  Indeed,

in WVIT v. Gray, No. CV-95-0547689S, 1996 Conn. Super. LEXIS 2841, at **2-3 (Conn. Super. Oct.

25, 1996) (attached to Stekloff Reply Aff. as Exhibit 41), the Court denied defendant's Motion to Strike

plaintiff's §52-570d claim based on the secret recording of workplace telephone conversations with

plaintiff's employees that "related to the business activities of the plaintiffs," holding that such

allegations formed the basis of a valid claim under the statute.  The Gray Court further noted, in the

context of denying the Motion to Strike plaintiff's "intrusion on seclusion" claim, that "employees do

have a reasonable expectation that discussions will not be secretly recorded by fellow employees with

whom they are chatting."  Id. at *10-11.  Rosen's first argument therefore fails, as §52-570d(a) contains

no wholesale exemption for "work-related" conversations.

_____

[20] As set forth in footnote 9, supra, at 14, Rosen's L.R. 56(a)(2) Statement appears to be mis-numbered.  Nevertheless, it is apparent from his responses to Paragraphs 38-40, and from his deposition testimony set forth in the IBM Defendants' Memorandum at 38-40, that Rosen does not dispute that he secretly tape-recorded three telephone conversations with Schieve, and one telephone conversation with Rebhorn, without obtaining either's consent.

Second, Rosen asserts that summary judgment should be denied on Schieve's and Rebhorn's Counterclaims because, in Rosen's (mistaken) view, neither Schieve nor Rebhorn suffered damages as a result of Rosen's illegal recording. See Rosen's Opposition at 47. Rosen's argument conveniently overlooks the fact that Schieve and Rebhorn seek summary judgment as to *liability only* on their illegal taping Counterclaims, not on damages. See IBM Defendants' Memorandum at 38-40. In a later procedural ruling in WVIT v. Gray, No. CV-950547689, 1997 Conn. Super. LEXIS 2745, at *3-4 (Conn. Super. Oct. 8, 1997) (attached to Stekloff Reply Aff. as Exhibit 42), the Court granted the plaintiff's motion for summary judgment on *liability only* because the defendant admitted secretly taping workplace telephone conversations with other WVIT employees. This is exactly what Schieve and Rebhorn seek here, where it is also undisputed that Rosen secretly tape recorded four private telephone conversations without obtaining either Schieve's or Rebhorn's consent.

Accordingly, summary judgment should be granted as to liability only on Counterclaims One, Two and Three, asserted by Schieve against Rosen. Summary judgment should also be granted as to liability on Counterclaim Four, asserted by Rebhorn against Rosen.

## III.    CONCLUSION

Rosen's Opposition confirms that, for all of its conspiracy-theory bluster, blatant mischaracterizations of the record, and Rosen's penchant for self-contradiction, there are no disputed issues of *material* fact to be tried with respect to the legal grounds on which the IBM Defendants seek summary judgment. Accordingly, for all of the foregoing reasons, and for those reasons discussed in the IBM Defendants' Memorandum, the Court should grant the IBM Defendants' Motion for Summary Judgment in its entirety as to all of Rosen's remaining claims and enter an Order dismissing Rosen's

Complaint.  The Court should also grant summary judgment as to liability on Schieve's and Rebhorn's

Counterclaims against Rosen.

Dated:  Stamford, Connecticut
        October 7, 2003

                                    Respectfully Submitted,

                                    By: _____
                                        Patrick W. Shea (ct 07071)
                                        Neil B. Stekloff (ct 19778)
                                        Paul, Hastings, Janofsky & Walker LLP
                                        1055 Washington Boulevard
                                        Stamford, CT  06901-2217
                                        Telephone:  (203) 961-7400
                                        Fax:  (203) 359-3031

                                        Counsel for the IBM Defendants

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing **The IBM Defendants' Reply Memorandum in Further Support of Their Motion for Summary Judgment on Plaintiff Nathan Rosen's Second Amended Complaint and on Defendants John Schieve's and Dale Rebhorn's Counterclaims Against Plaintiff (and all attachments thereto)** was served on the following counsel of record via courier on this 7th day of October 2003:

> Richard A. Bieder, Esq.
> Neal A. DeYoung, Esq.
> Koskoff Koskoff & Bieder
> 350 Fairfield Avenue
> Bridgeport, CT 06604

Neil B. Stekloff

-29-